IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

STATESBORO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 624-010 |
| | ) | |
| ROBERT HARRIS | ) | |
| KELVIN ROGERS | ) | |
| THOMAS COTHRAN | ) | |

**O R D E R**

Before the Court are motions by Defendant Rogers to exclude expert testimony on certain topics by Special Agent Harry Hamrick and Georgia Department of Corrections Special Agent Darrell Reynolds.  (Doc. nos. 116, 117.)  Defendants Harris and Cothran adopted these motions.  (Doc. no. 133.)  After careful consideration of the briefs, as well as all testimony taken and arguments made at the hearing on August 15, 2025, the Court **GRANTS** the motion regarding the challenged topics as to Special Agent Hamrick, (doc. no. 116), and **DENIES** the motion as to Georgia Department of Corrections Special Agent Reynolds, (doc. no. 117).

I.     **BACKGROUND**

The indictment charges Defendants with operating a drug trafficking scheme while inmates at a prison operated by the Georgia Department of Corrections ("GDC").  (See doc. no. 3; see also Transcript, doc. no. 180, p. 30 ("Tr.").)  On December 18, 2024, the government filed expert witness notices for Special Agent ("SA") Hamrick and GDC SA Reynolds.  (Doc. nos. 90, 92.)    Defendants moved to exclude both experts, arguing the notices were impermissibly vague and the experts are not qualified under Federal Rule of Evidence 702.

(Doc. nos. 116, 117.) Following the government's submission of amended expert notices, Defendants narrowed their objections to the experts' alleged lack of qualifications. (See doc. nos. 156, 166, 183.) The defense maintains SA Hamrick "is not qualified to give expert testimony about 'certain common, recurring practices employed by prisoners incarcerated in GDC facilities who are involved in trafficking narcotics.'" (Doc. no. 156, p. 2.) Regarding GDC SA Reynolds, the defense contends he "is not qualified to give expert testimony on either 'practices employed by incarcerated gang members engaged in the contraband trade in GDC facilities' or 'certain common, recurring practices employed by GDC inmates engaged in the contraband trade in GDC facilities.'" (Id.)

### A.     SA Hamrick's Proffered Opinions

The government's amended notice describes the following ten subjects that SA Hamrick will address within the overall topic of prison drug trafficking methods and practices:

(a) Smuggling methamphetamine, marijuana, and other controlled substances into GDC facilities for personal use and for sale to other inmates;

(b) Smuggling contraband such as tobacco, rolling papers, and lighters into GDC facilities for personal use and for sale to other inmates;

(c) Smuggling contraband such as jewelry and designer clothing into GDC facilities to openly display their wealth and status derived from the prison contraband trade;

(d) Smuggling contraband such as saw blades, screwdrivers, and drill bits into GDC facilities to enable tampering with doors, windows, and other prison infrastructure;

(e) Smuggling contraband cellphones, chargers, and Wi-Fi hotspots into GDC facilities for personal use and for sale to other inmates;

(f) Using contraband cellphones to coordinate the smuggling of the above-described contraband into GDC facilities and to coordinate its distribution within the facilities;

 (g) Using a range of diverse methods to smuggle the above-described contraband into GDC facilities, such as:

  (i) Having unincarcerated associates such as fellow gang members, family members, and corrupt correctional officers smuggle contraband hidden in their personal effects and body cavities;

  (ii) Having unincarcerated associates throw backpacks, footballs, and tennis balls packed with contraband over prison fences;

  (iii) Having unincarcerated associates fly contraband into GDC facilities via drones; and

  (iv) Having associates mail contraband into GDC facilities;

 (h) Coordinating these diverse smuggling efforts through complex networks of suppliers, packagers, couriers, throwers, drone flyers, and drivers;

 (i) Employing corrupt correctional officers and other prison personnel to assist in various ways such as by unlocking doors, acting as couriers, routing money, and actively smuggling contraband into GDC facilities; and

 (j) Engaging in romantic relationships with correctional officers to gain their cooperation and to groom them into progressively deeper involvement in contraband smuggling.

(Doc. no. 154, pp. 4-5.) The amended notice also provides SA Hamrick "will testify that the value of narcotics in prison tends to far exceed their value on the street due to the difficulty of introducing them into prisons and the concomitant supply-side limitations within prisons." (Id. at 6.)

  B. **SA Hamrick's Qualifications**

SA Hamrick has been a law enforcement officer since 1995. (Doc. no. 154, pp. 1, 8-10.) Between approximately 2002 and 2020, he served as a Special Agent with the U.S. Fish and Wildlife Service. (Id.) Around 2014, he was assigned to this agency's Special Investigations Unit, where he primarily investigated wildlife trafficking organizations. (Id.) This experience led him to work on "related narcotics trafficking investigations," and in 2020,

3

he was detached to the U.S. Drug Enforcement Administration ("DEA") as a Task Force Agent investigating narcotics. (Id.; Tr. 13.) He remains in this role today. (Doc. no. 154, pp. 1, 8-10.)

SA Hamrick first began investigating prison-related drug trafficking around March 2021 in connection with a case involving the GDC Criminal Investigations Division and local law enforcement. (Id. at 2.) This investigation involved a food service worker at Telfair State Prison who smuggled controlled substances into the prison through electronic key fobs. (Id.; Tr. 19-21.) The food service worker investigation "opened up a regular line of communication" between SA Hamrick and the GDC Criminal Investigations Division, which led to SA Hamrick's involvement in the above-captioned case and its companion case, United States v. Hall, et al., CR 624-009 (S.D. Ga. July 10, 2024). (Tr. 21-24.) SA Hamrick is the lead federal agent in the Hall case and a case agent in the above-captioned case. (Tr. 17.) The investigation of these two cases has spanned several years. (Tr. 31.)

SA Hamrick has also participated in an investigation in which he oversaw controlled buys between a confidential informant and a "prison broker," which is the term for "a GDC inmate directing the movement of controlled substances beyond the walls of the prison." (Doc. no. 154, pp. 2-3.) SA Hamrick's role with this investigation centered around managing the confidential informant. (Tr. 25-26.)

Furthermore, SA Hamrick has monitored wiretaps in other investigations involving prison brokers, with his primary responsibility being "line sheets and minimizations" to ensure protection of privileged attorney-client conversations. (Doc. no. 154, p. 3; Tr. 27-28.) At the hearing, SA Hamrick also revealed his involvement in another investigation with the GDC Criminal Investigations Division concerning an inmate and a GDC counselor. (Tr. 32-33.)

This case is related to the Hall case. (Tr. 35-36.) Finally, as part of his role with the DEA, SA Hamrick regularly receives phone calls from GDC Criminal Investigation Division personnel seeking DEA assistance. (Doc. no. 154, p. 3; Tr. 33.)

### C.     GDC SA Reynolds' Proffered Opinions

The original expert notice for GDC SA Reynolds included a section titled "Practices Employed by Gangs Engaged in the Prison Contraband Trade" and a corresponding list enumerating relevant practices. (Doc. no. 92, pp. 5-11.) The amended notice omits this section and instead references GDC SA Reynolds' proffered expertise regarding gangs and "the nature of their activities within GDC facilities" throughout the amended notice. (See, e.g., doc. no. 155, pp. 5-6; see also id. at 7 ("Special Agent Reynolds will testify about the nature of criminal street gangs' interactions with the GDC.").) Additionally, in GDC SA Reynolds' amended notice, the proffered expert testimony subparts about "certain common, recurring practices employed by GDC inmates engaged" in the prison contraband trade is identical to that contained in SA Hamrick's amended notice, as set forth in the block quote above. (Compare doc. no. 155, pp. 8-9, with doc. no. 154, pp. 4-6.) This notice does not state GDC SA Reynolds will offer any expert testimony about narcotics valuation. (See doc. no. 155.)

### D.     GDC SA Reynolds' Qualifications

GDC SA Reynolds began his career with the GDC as a probation officer in 2010, and he became a member of GDC's Security Threat Groups ("STG") Unit in 2014. (Doc. no. 155, pp. 4, 13-14; see also Tr. 41.) He is currently employed as the Statewide STG Coordinator and has been in this position for about two years. (Doc. no. 155, pp. 4, 13; Tr. 41-42.) Prior to this position, he served as an Assistant Statewide STG Coordinator for nine years. (Doc. no. 155, pp. 4, 13; Tr. 42.) Moreover, since 2018, GDC SA Reynolds has been a task force

5

officer with the FBI's Athens Safe Streets Gang Task Force. (Doc. no. 155, pp. 5, 14; Tr. 53-54.) GDC SA Reynolds has also testified as an expert witness in the field of criminal street gangs in about a dozen cases since 2021. (Doc. no. 155, pp. 2-3, 15.) None of these cases involved prison contraband, and he did not testify as an expert regarding practices employed by GDC inmates engaged in the prison contraband trade. (Tr. 60, 63.)

GDC SA Reynolds has directly participated in investigations regarding the prison contraband trade in both his STG and FBI task force officer roles. (Doc. no. 155, p. 5.) As the Statewide STG Coordinator, his primary goal is to "minimize the disruption [of] gangs" and "prevent gang-on-gang violence" in the prison system. (Tr. 106-07.) In working to fulfill these goals, GDC SA Reynolds encounters the prison contraband trade regularly because prison violence oftentimes "comes off the back of a contraband mishap." (Tr. 105-06.) In other words, he has gained knowledge about this topic because "there is substantial overlap between [STGs] and the prison contraband trade, i.e., a large percentage of the prison contraband trade is managed by incarcerated gang members." (Doc. no. 155, pp. 5-6.) GDC SA Reynolds needs to understand prison contraband introduction because it helps him better evaluate the causes of violence. (Tr. 112.)

After a violent incident occurs, a member of GDC SA Reynolds' team visits the facility to formulate a threat assessment, which GDC SA Reynolds uses to create a synopsis that he sends to "the higher-ups." (Tr. 108-09.) These synopses may include a detailed description of the contraband trafficking, though it depends on the thoroughness of the officer writing the original threat assessment report. (Tr. 109-10.) The goal of the threat assessment is to "stop the violence." (Tr. 109.) After determining the cause of the violence, GDC SA Reynolds passes the information along to the investigating agent and his "dealings with the case" cease.

(Tr. 115-16.)  In contrast to GDC SA Reynolds' role, the criminal investigation team directly investigates the incident to determine who was involved, how the incident occurred, and more.  (Tr. 109.)  After this process is complete, GDC SA Reynolds typically hears about the status of the criminal investigation in updates presented in regularly scheduled meetings.  (Tr. 110.)

Additionally, since about April 2023 in his capacity as Statewide STG Coordinator, GDC SA Reynolds also attends regular GDC meetings involving information relevant to the prison contraband trade.  (Doc. no. 155, pp. 6-7; Tr. 78-81, 110-12.)  He attends a monthly major case meeting where he learns about "major cases" from various GDC regions, "many of which center around the prison contraband trade."  (Doc. no. 155, p. 6.)  GDC SA Reynolds also participates in weekly GDC Office of Professional Standards supervisors' meetings, where he hears about "recent incidents," which commonly include "detects and intercepts" of contraband through the GDC K9 Unit.  (Id. at 7; Tr. 84-85.)  In these weekly and monthly meetings, GDC SA Reynolds also briefs other GDC personnel about gang-related assaults in GDC facilities, "many of which are directly related to the prison contraband trade."  (Doc. no. 155, pp. 6-7; Tr. 85-86, 88.)

In his former role as an Assistant STG Coordinator, GDC SA Reynolds attended monthly team meetings about "whatever [his co-workers'] cases involved," in which attendees discussed prison contraband "every time" or "oftentimes."  (Tr. 81-83; 113-14.)  Contraband included drugs as well as tobacco, cellphones, and more.  (Tr. 83-84.)  GDC SA Reynolds also attended quarterly team meetings with his subordinates where he would pass along information about "what they are seeing in the facilities" to the "higher-ups," oftentimes including information about prison contraband.  (Tr. 113-14.)  In these meetings, there would be a

7

discussion not only about the security aspect of the contraband trade, but also "the manner, methods, means" as well. (Tr. 114.)

Moreover, in his experiences conducting renunciation interviews with validated gang member inmates, GDC SA Reynolds uses a standard questionnaire that inquires into "the inmate's knowledge of activities related to the prison contraband trade." (Doc. no. 155, p. 6.) However, prison drug trafficking "hardly ever" comes up in these interviews because the inmate typically does not want to answer these types of questions. (Tr. 119.) GDC SA Reynolds also receives multiple daily reports from the "Comm. Center," which include information relevant to prison contraband about nine to ten times a day. (Tr. 116-17.) However, GDC SA Reynolds does not take action on these reports unless the issue is gang related. (Tr. 117.) He further encounters prison contraband when receiving calls from outside law enforcement who have encountered an inmate using a cellphone. (Tr. 117-18.) After obtaining the cellphone, the Digital Forensics Unit goes through the phone, and GDC SA Reynolds passes the report about the phone to the requesting law enforcement officer. (Tr. 118.)

GDC SA Reynolds has also presented at the Georgia Gang Investigators Association a couple of times, most recently in the summer of 2025, where he discussed current gang trends and "things that we've seen inside of the Department of Corrections as it relates to gangs." (Tr. 92.) He has also presented about gang and prison-related matters for state prosecutors at events hosted by the Prosecuting Attorneys Council of Georgia. (Tr. 93.) Furthermore, he assisted in creating "The Effects of Gangs in the GDC" lesson plan, which included a discussion of contraband introduced into prisons due to gang activity. (Doc. no. 155, p. 12; Tr. 113.)

Additionally, as an FBI Task Force Officer, he has listened to and decoded wiretap intercepts in at least one investigation involving the introduction of contraband into GDC facilities. (Doc. no. 155, p. 6; Tr. 55-56.) In this seven-month wiretap investigation, GDC SA Reynolds minimized and decoded gang slang. (Doc. no. 155, p. 6; Tr. 57, 103.) At the hearing, GDC SA Reynolds testified that none of his trainings and certifications, except for some instances comprised in the "450 hours of gang training," listed in his resume concerned prison contraband. (Tr. 98-101.) He instead stated he "[didn't] think you're going to get that [prison contraband] training until you step foot in a prison," also describing it as "on-the-job training." (Tr. 98-99.)

## II.  DISCUSSION

### A.  Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony and reflects the trial court's "gatekeeping" function as described in the landmark case Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny. See Fed. R. Evid. 702. Applying the three-pronged test developed by the Eleventh Circuit to assess admissibility of expert testimony under Rule 702, the Court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)); see also Doe v. Rollins Coll., 77 F.4th 1340, 1347 (11th Cir. 2023) (noting Rule 702 "has three basic requirements: the expert

9

must be qualified; his methodology must be reliable; and his testimony must be helpful to the trier of fact").

This test boils down to qualification, reliability, and helpfulness, Frazier, 387 F.2d at 1260, and the proponent bears the burden of establishing all three by a preponderance of the evidence, United States v. Wright, No. 4:19-CR-149, 2024 WL 1957316, *3 (S.D. Ga. May 3, 2024) (citing Daubert, 509 U.S. at 592, n.10); see also D. H. Pace Co., Inc. v. Aaron Overhead Door Atlanta LLC, 526 F. Supp. 3d 1360, 1366–67 (N.D. Ga. 2021) ("The proponent of expert testimony 'always bears the burden to show that his expert is qualified to testify competently regarding the matters he intended to address, the methodology by which the expert reached his conclusions is sufficiently reliable, and the testimony assists the trier of fact.'").

Here, while the parties may disagree about the relevance of gang membership, (see doc. no. 156, p. 3), there is no dispute the proffered expert testimony would be helpful because the prison contraband trade is the issue at the heart of this case and its intricacies are beyond the scope of the average lay person. See, e.g., United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006) ("[W]e have recognized the 'well-established' 'rule' that 'an experienced narcotics agent' may testify as an expert . . . ." (quoting United States v. Butler, 102 F.3d 1191, 1199 (11th Cir. 1997)). The Court thus turns to qualifications and reliability.

Concerning an expert's qualification, there is no doubt that experience is a perfectly permissible means by which one may qualify as an expert. See Frazier, 387 F.3d at 1260-61 ("While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status."); Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, *experience*, training, or education may testify . . . ." (emphasis added).) Indeed, the advisory committee note to the 2000 amendment readily

supports this proposition, which provides "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 advisory committee's note (2000 amends.). "[T]here is no mechanical checklist" for establishing an expert is qualified to provide opinion evidence. Fox v. Gen. Motors LLC, No. 1:17-CV-209, 2019 WL 3483171, at *4 (N.D. Ga. Feb. 4, 2019) (citations omitted). Rather, "Rule 702 takes a liberal view of expert witness qualifications; thus, an expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case." Id. at *28. Accordingly, "[g]aps in an expert witness' qualifications or knowledge generally go to the weight of the witness' testimony not its admissibility." Id. (citations omitted). In other words, the expert must be "minimally qualified," as "objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." Feliciano v. City of Miami Beach, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012).

Nonetheless, even if an expert's experience renders them qualified to testify competently, the reliability of the expert opinion must be independently assessed. See Frazier, 387 F.3d at 1261 (reasoning "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express"). The 2000 advisory notes explain "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000 amends.). To evaluate reliability of a non-scientific, experience-based expert opinion, although the non-exhaustive factors applied in assessing the reliability of *scientific* expert opinions may be relevant, "[s]ometimes, other questions may be

11

more useful." Frazier, 387 F.3d at 1262. Accordingly, trial courts enjoy "considerable leeway" in assessing reliability, as this analysis varies across cases. Id. (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)). Ultimately, an expert "must be able to demonstrate a sufficient connection between [his] experience and the opinion [he] offers." Frazier v. Se. Ga. Health Sys., Inc., No. 2:21-CV-21, 2023 WL 4138358, at *4 (S.D. Ga. June 22, 2023).

> **B. SA Hamrick's Proposed Expert Opinions on Prison Drug Trafficking Are Excluded Because He Is Not Minimally Qualified, His Opinions Are Not Sufficiently Supported by His Limited Experience, and His Dual Role as a Case Agent Especially Risks Prejudicing the Jury**

The Court excludes SA Hamrick from providing expert opinions about the "common, recurring practices employed by prisoners incarcerated in GDC facilities who are involved in trafficking narcotics," (doc. no. 154, p. 4), because (1) he is not minimally qualified, (2) his limited experience with this subject renders his opinions unreliable, and (3) there is an unacceptable risk of prejudice should he testify concerning prison trafficking methods he observed while investigating this case as both an expert and a case agent.

First, SA Hamrick is not qualified to testify as an expert witness on the topic of prison drug trafficking because his experience in this area is too limited. The bulk of SA Hamrick's experience with prison drug trafficking comes from his work on this case, the Hall companion case, and a related investigation concerning an inmate and GDC counselor. (Tr. 28; 35-36.) With respect to investigations that are entirely unrelated to this case, SA Hamrick only has been involved in two others that concern prison drug trafficking, i.e., one involving a food service worker and another involving a prison broker. (Tr. 22-24; 26-27.) Moreover, for the prison broker investigation, SA Hamrick's role was to manage the confidential informant, and

thus his focus was on activities that occurred outside of the prison. (Doc. no. 154, pp. 2-3; Tr. 25-26.) Although he participated in "other investigations involving prison brokers," his role was confined to line sheets and minimizations. (Doc. no. 154, p. 3; Tr. 27-28.) The amended notice styles SA Hamrick as "a primary point of contact" for GDC personnel, (doc. no. 154, p. 3), which involves him receiving regular phone calls, (Tr. 33), but there is no further explanation about what this role entails or how it bolsters his experience with prison drug trafficking.

Furthermore, SA Hamrick's particular role in many of these investigations was only vaguely described. For example, the government's amended notice does not specify SA Hamrick's role in the food service worker investigation but rather describes law enforcement's efforts generally. (Doc. no. 154, p. 2; Tr. 21.) Additionally, although there was a discussion of the prison counselor case at the hearing, SA Hamrick's particular role in this investigation was not detailed. (See Tr. 33, 35-37.) Ultimately, this lack of detail is significant because it is the proponent of the expert's burden to establish their expertise. Wright, 2024 WL 1957316, at *3. For these reasons, the government has not met its burden to establish SA Hamrick's participation in the described investigations rises to the level of experience necessary to demonstrate he is "qualified to competently testify" as an expert on prison drug trafficking. Frazier, 387 F.3d at 1260.

Second, even if the Court were to conclude SA Hamrick is minimally qualified, his opinions concerning prison drug trafficking should still be excluded because they are not sufficiently reliable. After all, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." Frazier, 387 F.3d at 1361.

13

Where, as here, "the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000 amends.).

Taken together, his investigative work does not establish a sufficiently robust knowledge base about prison narcotics trafficking, especially since two of the cases – Hall and the prison counselor case – are related the case *sub judice*. Moreover, the unrelated cases concerning the food service worker and prison broker involved a few to none of the subparts about prison drug trafficking listed in the amended notice. (Tr. 22-24, 26-27.) Therefore, SA Hamrick's conclusions about prison drug trafficking are not sufficiently reliable because his knowledge basis for such conclusions is predicated on too small of a sample size, which is further compounded by the intertwined nature of the three related cases.

Third and perhaps most importantly, the majority of his expertise on this topic comes from his role as a case agent in this case and its closely related companion case. And as Defendants argue, special concerns arise when case agents occupy the "dual role" of a fact witness and expert witness. (See doc. no. 166, pp. 4-5.) Indeed, the Eleventh Circuit has warned about "[t]he dangers presented by such 'dual testimony,'" which "include, among others: that it confers upon the agent an 'aura of special reliability and trustworthiness[.]'" United States v. Hawkins, 934 F.3d 1251, 1266 (11th Cir. 2019) (quoting United States v. Dukagjini, 326 F.3d 45, 53 (2d Cir. 2003)). Here, these dangers are especially heightened because the foundation of SA Hamrick's expertise on prison drug trafficking stems from his investigative work on the above-captioned case and Hall, revealing his expertise is intrinsically tangled with his role as case agent. See United States v. Graham, 123 F.4th 1197, 1260 (11th

14

Cir. 2024) ("As our cases explain, the district court must ensure that expert testimony under Rule 702 does not come in under the guise of lay opinion testimony under Rule 701 . . . [a]nd in order to carry out this task, the district court must indeed act as a gatekeeper. Otherwise, dual-capacity opinion testimony may prove problematic." (citations omitted)).

For these reasons, the Court excludes SA Hamrick from offering expert testimony on "certain common, recurring practices employed by prisoners incarcerated in GDC facilities who are involved in trafficking narcotics." (Doc. no. 154, pp. 4-6; see also doc. no. 156, p. 2.) Importantly, based on the notice of unresolved disputes, (see doc. no. 156), Defendants do not argue the Court should disallow SA Hamrick's testimony concerning the "methods and techniques commonly used by individuals engaged in the illegal trafficking of controlled substances." (Doc. no. 154, pp. 3-4). Accordingly, the Court excludes SA Hamrick's testimony only to the extent it concerns the more specific topic of prison drug trafficking.

### C. GDC SA Reynolds' Proposed Expert Testimony on the Prison Contraband Trade Is Admissible Because He Is Qualified, and His Opinions Are Sufficiently Reliable Based on His Extensive Experience

As a preliminary matter, although the defense disputes the relevance of gang information, the notice of unresolved disputes provides this matter will be addressed during the motion in limine stage. (Doc. no. 156, p. 3; see also doc. no. 166 ("[Defendant] Rogers noted these outstanding concerns [about the relevance of gang membership] and will raise them . . . at the motion in limine stage of this case.") Indeed, none of the briefs submitted after this notice address this dispute. (See doc. nos. 166, 183.) Thus, the Court will not decide this issue at this time, and the below section only concerns GDC SA Reynolds' disputed expertise about the prison contraband trade.

The defense does not dispute GDC SA Reynolds is an expert in criminal street gangs. (Doc. no. 183, p. 14.) They do, however, dispute his expertise regarding prison contraband trafficking, both by gang member and non-gang member inmates. (See id. at 8-14.) The crux of the defense's argument is that because GDC SA Reynolds is a "gang specialist," his knowledge and experience with the prison contraband trade comes secondary and is thus insufficient to qualify him as an expert in this regard. (See id.) Although this argument correctly acknowledges the lens with which GDC SA Reynolds performs much of his work, it overlooks the significant depth of knowledge he has accumulated on this subject over the course of his GDC career. Accordingly, the Court declines to exclude him from providing expert testimony on the prison contraband trade.

First, GDC SA Reynolds is qualified to competently testify about the prison contraband trade based on his professional experience. Through his nine-year career with the GDC STG Unit and his time as an FBI Task Force Officer, he has encountered and addressed prison contraband trafficking and contraband on a daily basis and in a variety of contexts. (Doc. no. 155, pp. 5-7.) Indeed, he has directly participated in investigations relating to this subject and regularly handles threat assessments involving incidents caused by contraband introduction issues. (Id. at 5-6; Tr. 106-09.) The defense's argument emphasizes that the focus of these threat assessments is to prevent further violence rather than to investigate the details of the prison contraband trafficking at issue. (See doc. no. 183, p. 14.) Regardless of his focus, GDC SA Reynolds is constantly exposed to, studying, discussing, and engaging in team efforts to diminish the impact of prison drug trafficking, and he has been doing so for nearly a decade. (Doc. no. 155, p. 4.) His hearing testimony discussed in Section I.D *supra* and the amended notice demonstrate he has become acutely aware of the ins and outs of the prison contraband

16

trade as he tackles incident after incident across the state, even despite his primary concern being gang violence.  (See doc. no. 155, pp. 4-5); see also Giusto v. Int'l Paper Co., 571 F. Supp. 3d 1346, 1362 (N.D. Ga. 2021) ("As summarized by one district court . . . '[g]eneral knowledge in a field . . . is normally sufficient to qualify a witness as an expert in that field's specialties as well.'" (quoting Goforth v. Paris, No. CIVA 5:02-cv-94, 2007 WL 988733, at *3 (M.D. Ga. Mar. 30, 2007))); McDowell v. Brown, 392 F.3d 1283, 1297 (11th Cir. 2004) (explaining a "physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline").

In addition to his direct experience with analyzing prison contraband through threat assessments and other investigations, he also has been constantly involved in discussions about this subject at regular meetings throughout his nine-year career.  (Doc. no. 155, pp. 6-7.)  The defense contends his attendance at such meetings is insufficient to establish an expertise in the subject of prison contraband trafficking.  (Doc. no. 183, p. 14.)  But this argument overlooks the ways in which such meetings supplement his knowledge about this subject in light of his direct experiences assessing incidents related to prison contraband.  Furthermore, GDC SA Reynolds briefs his own cases at such meetings.  (Doc. no. 155, pp. 6-7; Tr. 86-87.)  Although his cases "oftentimes" involve assaults, (Tr. 87), "many" of these cases involve prison contraband trafficking, (doc. no. 155, p. 7), thus undermining the defense's characterization that he is a passive observer.

In sum, to use GDC SA Reynolds' own words, one gains an understanding of the prison contraband trade through "on-the-job training."  (Tr. 99.)  And, as discussed in detail above, GDC SA Reynolds has plenty of it.  Thus, based on his direct professional involvement with the prison contraband trade in combination with the information he gleans on this subject at

17

regular meetings, GDC SA Reynolds has the requisite qualifications to competently testify about this subject.

GDC SA Reynolds' conclusions on the prison contraband trade are also sufficiently reliable. As explained, when qualified based on experience, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000 amends.). In other words, there must be a sufficient connection between GDC SA Reynolds' experience and his offered opinions. See Frazier, 2023 WL 4138358, at *4 ("[T]o admit [expert's] opinion, [he] must be able to demonstrate a sufficient connection between [his] experience and the opinion [he] offers.").

As discussed, GDC SA Reynolds has almost a decade of experience working with the GDC STG, and throughout his career, he has become familiar with the means and mechanisms of prison contraband trafficking through both his own work and the work of others. Importantly, as the Statewide STG Coordinator, his professional experiences span the entire state, thereby providing him with a sufficiently diverse knowledge base. Therefore, his opinions are not based on a handful of investigations but instead are the product of varied relevant experiences accumulated over the years. Although his main concentration is gangs, there is significant overlap with this topic and prison contraband, (doc. no. 155, pp. 5-6), and GDC SA Reynolds has a variety of distinct experiences to draw from in reaching his conclusions. Thus, his conclusions are sufficiently reliable.

In sum, the length of his career, depth of knowledge, and diversity of experiences work together to ensure his conclusions on the prison contraband trade are sufficiently reliable.

Because he is qualified, his opinions are reliable, and they would be helpful to the average layperson, his expert testimony on this subject is admissible.

### III. CONCLUSION

For the above-mentioned reasons, the Court **GRANTS** the motion to exclude SA Hamrick's expert testimony about "certain common, recurring practices employed by prisoners incarcerated in GDC facilities who are involved in trafficking narcotics," (doc. no. 116), and **DENIES** the motion to exclude GDC SA Reynolds' expert testimony on the prison contraband trade, (doc. no. 117). Nothing in this Order should be construed as precluding these experts from offering expert testimony not challenged in the notice of unresolved disputes. (See doc. no. 156.) Furthermore, this Order does not prevent later objections, such as those under Rule 403, to either witnesses' expert testimony. See Frazier, 387 F.3d at 1363 ("[S]ometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403.").

SO ORDERED this 16th day of October, 2025, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA